**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.  05-0175 (RWR)** |
| | : | |
| **v.** | : | |
| | : | |
| **RICK VAN BRYSON,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| _____ | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing.  For the reasons set forth herein, the Government respectfully recommends that the Court sentence the defendant to a term of 6 months, to include a period of home detention and not incarceration.  The Government submits that such a sentence would fall squarely within both the U.S. Sentencing Guidelines range proposed by the Probation Officer in the Presentence Investigation Report (PSR)(Level 10)(6-12 months) and the Guidelines range set forth in the Plea Agreement between the Government and the defendant (Level 8)(0-6 months).  Such would be a reasonable and fair sentence given the Plea Agreement, the defendant's subsequent cooperation with the Government and the PSR's conclusions concerning the applicable Sentencing Guidelines Manual (2004).

## I.  BACKGROUND

On May 12, 2005, the Grand Jury returned an Indictment against the defendant, a podiatrist named Dr. Rick Van Bryson.  The Indictment charged him with eight counts of health

- 1 -

care fraud in violation of 18 U.S.C. Sections 1347 and 2.  On August 16, 2005, a one count

Superseding Information was filed charging the defendant with one count of making false

statements relating to health care matters in violation of 18 U.S.C. Sections 1035 and 2.

On August 17, 2005, the defendant pled guilty to Count One of the Information in

accordance with a written plea agreement.  The defendant signed a written Statement of Offense,

or proffer of evidence, laying out the basic facts which he acknowledged as part of his plea

agreement.  The defendant also waived his jury trial and other constitutional rights and the Court

accepted the plea.  The defendant is now before the Court for sentencing..

## I.  <u>SENTENCING CALCULATION</u>

A.    <u>Statutory Maxima</u>

The defendant was convicted by plea of one count of making false statements relating to

health care matters in violation of 18 U.S.C. Sections 1035 and 2.   The maximum sentence for

this offense is a term of imprisonment of not more than five years, a fine of $250,000, or a fine of

twice the pecuniary gain or loss pursuant to 18 U.S.C. Sections 3571(b)(3) and (d).   The Court

also must impose a $100 special assessment and may impose a three year term of supervised

release, an order of restitution, and an obligation to pay any applicable interest or penalties on

fines or restitution not timely made.

B.    <u>Sentencing Guideline Calculation</u>

The PSR Sentencing Guidelines calculation differs from the calculation of the

Government and defendant in the Plea Agreement in this case.  The essence of the disagreement

is whether or not the Court - if applying the Guidelines Manual in effect at the time of the

offense, the 2000 rather than 2004 Sentencing Guidelines Manual - would increase the

defendant's sentencing calculation by two levels for "more than minimal planning"

under U.S.S.G. Section 1B1.1 (2000 Guidelines Manual).   If the answer to this question is "yes,"

then, as the PSR states, the 2000 and 2004 Guidelines Manuals produce the same Sentencing

Guidelines result, a total offense level of 10.   In that case, the Court should apply the 2004

Manual, i.e., the manual in effect at the time of sentencing,  pursuant to U.S.S.G. Section 1B.11

(a) and (b), because aplying the 2004 manual would not violate the ex post facto clause.   If the

answer is "no" and the Court finds that it would not impose the "more than minimal planning"

increase under the 2000 Guidelines, then the 2000 Guidelines would produce a lower total

offense level of 8 rather than the level 10, there would be an ex post facto issue, and the 2000

Guidelines should be applied.

 The Government submits that the PSR application of "more than minimal planning" is a

reasonable interpretation of the 2000 Guidelines Manual and Comment 1 to Section 1B1.1.  It is

true, as the PSR states, that  Comment 1 to Section 1B1.1 in the 2000 Guidelines states that

"'more than minimal planning' is deemed present in any case involving repeated acts over a

period of time, unless it is clear that each instance was purely opportune."

 It is indisputable that the defendant engaged in repeated acts over a period of time.   There

is room for debate, however, over whether those acts were "opportune."  The Government

submits that, although the defendant indeed needed to correctly provide reimbursable Medicare

codes to his staff in order to fraudulently bill Medicare, and on occasion wrote medical notes for

patient treatment which were false, he was so experienced in treating Medicare patients that it

was virtually second nature for him to recall reimbursable codes and there is no regularity to the timing of the improper billing.  In short, the defendant did not appear to have an elaborate, well organized plan to defraud Medicare.   Rather, he treated elderly patients as part of his practice and, arguably, simply took advantage of the system - by using reimbursable Medicare billing codes rather than non-reimbursable ones - when the opportunity presented itself.

The Government defers to the Court on the issue of "more than minimal planning" since the Government and defendant did not calculate such an increase into their sentencing calculations in the Plea Agreement.

The Government's position on the individual components of the appropriate Sentencing Guidelines calculation in this case is laid out below:

(1)    Base Offense Level

The PSR, the Government and defense counsel agree that the Base Offense Level is a level 6 in this case for the offense of making false statements relating to health care matters, in violation of 18 U.S.C. Section 1035..  This is true whether the Court applies the 2000 Guidelines Manual (Section 2F1.1(a)) or the 2004 Guidelines Manual (Section 2B1.1(a)(2)).

(2)    Specific Offense Characteristic: Loss Amount

The PSR and the Government agree that the loss amount is $37,417.34 or approximately $38,000.  Defense counsel takes the position that the loss amount is $20,050.40, or approximately $20,000, based on some communications apparently between a prior prosecutor and prior defense counsel.  The Government submits that this was prior to the Indictment, the Superseding Information and subsequent plea discussions leading to the defendant's current

conviction.

While the Plea Agreement does not contain a loss amount, the Government submits that it was made clear to the defendant during plea discussions that the loss amount in this case was approximately $38,000 and would fall between $20,000 and $40,000 for Sentencing Guidelines purposes. Defense counsel asked the current prosecutor to agree to a loss amount of approximately $20,000, but the Government did not assent to this request.

The Government has calculated a loss amount of $ 37,417.34 based on the following analysis. The defendant pled guilty, pursuant to his Statement of Offense, to a scheme and artifice to defraud Medicare which existed "from sometime in approximately 1998 until in or about September, 2001." See Statement of Offense, paragraph 9. As part of that scheme, the defendant intentionally and fradulently obtained money from Medicare by billing for reimbursable services which he did not perform. In fact, he either performed different non-reimbursable services or, as in one case, no services at all. Id. at paragraph 20.

The scheme to defraud included the false Medicare billing for the treatment of 7 patients outlined in Counts 1 through 8 of the Indictment and admitted to by the defendant in his subsequent Plea Agreement and Statement of Offense. See Statement of Offense, paras. 14-21. It also included the false billing of a number of other patients, all part of the admitted scheme to defraud during the relevant time period, but not outlined in detail in the Indictment or Statement of Offense. Because defrauding Medicare in the treatment of these patients was also part of the scheme, it has been included in the calculation of the loss amount in this case.

The specific loss amount of $37,417.34 includes the combination of (1) the actual loss to the 7 patients for whom the defendant defrauded Medicare and acknowledged in paragraphs 14 through 21 of the Statement of Offense. This includes both the defendant's admitted misconduct and the expert opinion of a Government retained podiatrist, Dr. Michael Theodolou, that the defendant's treatment was fraud; (2) the total loss for a series of Medicare claims reviewed by a second Government retained podiatrist, Dr. Paul Kinberg, who examined the defendant's medical files and found further evidence of fraud in the form of improper medical notes and other documentation; (3) the total loss encompassing patient files exhibiting fraud where the defendant failed to write medical notes, consistent with standard medical practice, supporting the billings he submitted to Medicare; and (4) the total loss encompassing claims submitted for a number of Medicare patients who told HHS agents, in written surveys, that they did not in fact receive the type of treatment for which the defendant billed Medicare. Tthe Government submits that this is a fair and reasonable estimate of the loss amount in this case because it is directly tied to individual patients treated by the defendant.

       (3)     <u>Victim Related Adjustments</u>

       The PSR, the Government and the defendant agrees that there are no victim related adjustments in this case.

       (4)     <u>Adjustment for Role in the Offense</u>

The PSR, the Government and the defendant agree that there is no adjustment for role in the offense in this case. This is separate and apart from the "more than minimal planning" issue noted above.

- 6 -

(5)     <u>Adjustment for Obstruction of Justice</u>

The PSR, the Government and the defendant agree that there is no adjustment for obstruction of justice in this case.

(6)     <u>Adjusted Offense Level</u>

The Government and the defendant agreed in the Plea Agreement that the Adjusted Offense Level would be 10 under the 2000 Guidelines Manual.  The PSR submits that it should be a 12 under the 2004 Guidelines, essentially taking the position that if you apply a two level increase for "more than minimal planning" under the 2000 Guidelines, the Adjusted Offense Level is 12 (Base Offense Level (6) plus  "more than minimal planning" (+2) plus a two level increase for loss amount of $20,000 to $40,000 (+4).  Since the Government did not seek the 2 level increase for "more than minimal planning" in the Plea Agreement, it submits that if the Court applies the calculations of the parties in the Plea Agreement, the proper Adjusted Offense Level is a Level 10.   If the Court agrees with the PSR that the "more than minimal planning" increase would apply under the 2000 Guidelines Manual, adding 2 levels to the Guidelines calculation, then, as the PSR concludes, the Adjusted Base Offense Level would be a Level 12.

(7)     <u>Chapter Four Enhancements</u>

The PSR, the Government and the defendant agree that there are no enhancements under Chapter Four of the Sentencing Guidelines.

(8)     <u>Total Offense Level</u>

The PSR submits that the Total Offense Level is 10 for the reasons stated above.  If the Court agrees that "more than minimal planning" should apply under the 2000 Guidelines

Manual, this is correct.  If the Court concludes that it should not, the correct Total Offense Level is that calculated by the parties in the Plea Agreement, a Level 8.

       (9)   <u>Restitution</u>

The PSR notes that, under 18 U.S.C. Sections 3663(A)(a)(1) and (3), the Court shall enter an order for restitution.   In the Plea Agreement, the Government agreed not to seek restitution in this case.  However, the Government notes that the victim in this case was in fact the Medicare Program, and to the extent that the Court choses on its own to impose restitution, the Government proffers the loss amount for sentencing purposes as $37,417.34.  However, the Government is not seeking restitution in this case.

       C.   <u>The Impact of Booker</u>

The Court should impose a sentence within the Guideline range for a Level 8 or Level 10, depending upon its utlimate conclusion on the "more than minimal planning" issue. .

In <u>United States v. Booker</u>, 2005 WL 50108 (U.S. Jan. 12, 2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004).  In consequence, the Court invalidated the statutory provision that made the Guidelines mandatory: Title 18, United States Code, Section 3553(b)(1).  <u>Booker</u>, 2005 WL 50108, at *16. However, the Court expressly refused to invalidate the Guidelines in their entirety.  To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime.  Indeed, it remains the case that if the sentencing court imposes a sentence that is outside

the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines.  See 18 U.S.C. § 3554(c)(2).  The sentence will then be subject to review by courts of appeals for "reasonableness."  Id. at *24.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing).  "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  Booker at *27 (citing 18 U.S.C.A. §§ 3553(a)(4)&(5) (Supp. 2004)).  In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se.  Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the salutary goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress.  The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in Section § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for

the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 2005 WL 50108, at *26; see id. at *27 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court. Every Supreme Court Justice

in the various opinions in <u>Booker</u> recognized the express national policy goals, as articulated by

Congress, that sentences be uniform across the country, to the extent possible, and that sentences

be based on the offender's actual conduct and history.  <u>See, e.g.</u>, <u>id.</u> at *21 (majority opinion of

Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing

system in the direction of increased uniformity."); <u>id.</u> at *19 (same) ("Congress' basic statutory

goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial

efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of

conviction."); <u>id.</u> at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing

disparity, which Congress determined was chiefly the result of a discretionary sentencing regime,

was unquestionably Congress' principal aim."); <u>id.</u> at *47 (dissenting opinion of Scalia, J.) ("the

primary objective of the Act was to reduce sentencing disparity.").  Since the Guidelines

currently represent the only extant benchmark to encourage uniformity and thus the only tool to

implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are

currently the only mechanism available to implement Congress' basic statutory goals.

<u>Booker</u>, to be sure, departs from the prior practice of automatic reversal that would have

accompanied the failure to sentence a defendant within the Guidelines.  Such a sentence will now

be reviewed instead for its "reasonableness."  <u>See</u> <u>Booker</u>, at *24.  Nevertheless, the Guidelines -

- resulting as they do from years of study of sentencing practices, crime statistics, national crime

policy, and consideration of the factors that inform sentencing, <u>see</u> 18 U.S.C. § 3553(a) – provide

the most concrete yardstick against which to measure what would be unreasonable.  <u>Booker</u> not

only prevents courts from substituting their individual judgment about the appropriateness of the

Guidelines range without explaining with specificity their reasoning, <u>Booker</u> also continues to

subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review.  See Section 3553(c) (mandating consideration of the Guidelines); section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances.  This is so, said the court in United States v. Wilson, 2005 WL 78552 (D. Utah Jan. 13, 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress.  The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference.  Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness.  For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence.  In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons."  Id. at *1.  A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent –

in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.[1]

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing. Therefore, the Government respectfully recommends that the Court sentence the defendant within the Guidelines range calculated either by the Government and defendant in the Plea Agreement or in the PSR.

## III.   DEFENDANT SHOULD BE SENTENCED AT THE HIGH END OF THE LEVEL 8 RANGE OR THE LOW END OF THE LEVEL 10 RANGE

In determining the appropriate sentence, the Court "shall consider . . . the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The defendant in this case committed a serious offense by fraudulently billing Medicare for reimbursable medical procedures on senior citizens which he had not in fact performed. The defrauding of Medicare is national plague which costs the Government, and in the end taxpayers, millions of additional dollars every year. It is particularly troublesome when an individual

---

[1] In United States v. Ranum, No. 04-CR-0031 (D. Wisc., Jan. 19, 2005), the court takes issue with the observation in Wilson that post-Booker courts should depart only in unusual cases and for clearly identified and persuasive reasons. Ranum's arguments are unpersuasive. Ranum fails to explain why Booker, by severing the provisions which make the Guidelines mandatory, would invite courts to depart in usual or ordinary cases, or for unclearly identified or unpersuasive reasons. Nor is an explanation for such a departure apparent in any other source. Section 3553(a), which sets forth sentencing considerations, including reference to the Guidelines, is but one part of an entire statutory scheme. For example, Section 3553(c), which mandates written explanations for the imposition of non-Guidelines sentences, remains intact. To ignore the rest of the statutory scheme designed to effectuate the implementation of the considerations enumerated in the provision – in particular the expertise of the Sentencing Commission, the formation of the Guidelines, and congressional oversight of the Guidelines – would be an unreasoned approach to determining a sentence.

commits a crime against the elderly, who are often, by either physical or mental infirmity, incable of seeing the truth from the fraud perpetuated on them.

It is also true, however, that a defendant should be given more lenient treatment where that defendant fully accepts responsibility, is truthful with the Government and shows a desire to reform themselves and lead a productive life. The defendant in this case, Dr. Rick Van Bryson, has exhibited that he has accepted responsibility and can and will be a productive member of society in his future endeavors in a number of ways.

First, the defendant began discussions to enter into a plea agreement very shortly after facing the return of his Indictment on May 12, 2005. While it would have been preferable for him to enter a pre-Indictment plea, it would appear that the defendant had a series of lawyers prior to current defense counsel who did not fully explain to him the magnitude of the situation he faced. Since the fraud occurred almost five years ago, it appears that the defendant and prior counsel may have been of the view that this case would go away unindicted, and possibly pass the statute of limitations for the crimes charged. Prior conduct by the Government in this case may have made that a reasonable conclusion, but one which the defendant did not realize was mistaken.

Second, the defendant was fully and completely truthful about his conduct in this case from the time he met with the Government to discuss a plea agreement. He acknowledged each of the individual fraudulent Medicare billings detailed in the Statement of Offense, as well as the nature of the overall scheme. He showed remorse, accepted responsibility and did what the Government asked of him.

Third, the defendant went beyond accepting responsibility by meeting with the Government recently to provide information on other medical professionals in the Washington, D.C. area who may be engaged in Medicare fraud. While the Government has not yet fully assessed the information provided by the defendant, it appears to be helpful and may lead to additional prosecutions. The defendant did this despite the fact that he had not entered into a cooperation plea agreement with the Government.

Finally, the defendant faces a minimum five year suspension from Medicare in this case. While the Government is not taking the position that collateral consequences to the defendant should minimize the sentence in this case, there is a punitive element to other consequences in this matter which will certainly deter, if not prevent, future misconduct in Medicare billing by the defendant.

In sum, the Government submits that while the Court should bring to bear the full weight of the law and the Sentencing Guidelines where a defendant is convicted at trial, wastes resources and shows no remorse, it also should show more leniency where a defendant accepts responsibility, saves Government resources and appears ready, willing and able to be a productive member of society and to use his unique talents for the benefit of the poor and disadvantaged. In this case, the defendant often treated poor senior citizens for whom few doctors would provide treatment. And although he should not have billed Medicare for doing so, he provided a great personal service by washing feet and clipping the toenails of individuals who were incapable of even performing those basic tasks for themselves.

## IV.  CONCLUSION

Wherefore, the Government respectfully requests that the Court sentence the defendant to a term of 6 months under a probationary sentence, with a period of  home detention, in addition to whatever supervised released and other conditions the Court may impose on the defendant.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

_____
JAMES G. FLOOD
Assistant United States Attorney
For the District of Columbia
Fraud & Public Corruption Section
555 4th Street, N.W., Room 5428
Washington, D.C. 20530
(202) 514-7131

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Government's Memorandum in Aid of Sentencing has been served by facsimile on counsel for the defendant, Tony W. Miles, Esq., Federal Public Defender Service, 625 Indiana Avenue, N.W., Suite 550, Washington, D.C. 20004 on this ____ day of October, 2005.

_____
JAMES G. FLOOD
ASSISTANT U.S. ATTORNEY